**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| KULAMOON, INC.<br><br>Plaintiff,<br><br>v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA,<br><br>Defendants. | Court No. 26-2926 |

**COMPLAINT**

Plaintiff, Kulamoon, Inc. ("Plaintiff"), by and through its attorneys, alleges and states as follows:

1. This action challenges the unlawful assessment and collection of import duties imposed by Defendants under the purported authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1708.

2. Plaintiff is a United States-based importer whose merchandise is subject to the IEEPA duties challenged herein. As an importer of record, Plaintiff bears direct financial responsibility for the payment of those duties on each entry of goods imported into the United States.

3. Beginning in February 2025, President Trump issued a series of executive orders invoking IEEPA as authority to impose substantial new tariffs (the "IEEPA tariffs") on imported goods originating from nearly every foreign country, including countries from which Plaintiff regularly sources its merchandise. Those executive orders directed Defendants to assess and collect the IEEPA tariffs on Plaintiff's imports, thereby imposing a significant and ongoing financial burden on Plaintiff.

4. The lawfulness of those executive orders and the IEEPA tariffs they directed has since been conclusively resolved by the Supreme Court of the United States. On February 20, 2026, the Supreme Court held that IEEPA does not authorize the President to impose tariffs of this nature. *Learning Resources, Inc. v. Trump*, Appeal Nos. 24-1287 and 25-250, 2026 WL 477534 (U.S. Feb. 20, 2026).

5. The Supreme Court's ruling in *Learning Resources* arose from the consolidation of two lower-court proceedings. The first was *Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), in which certiorari was granted before judgment, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025). The second was a companion case originating in this Court, *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), which was affirmed by the United States Court of Appeals for the Federal Circuit, 149 F.4th 1312 (Fed. Cir. 2025), and thereafter granted certiorari, Appeal No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025). Both lower courts had independently held that IEEPA does not authorize the challenged tariffs. Following oral argument on November 5, 2025, the Supreme Court affirmed the Federal Circuit's judgment in Appeal No. 25-250 and vacated and remanded Appeal No. 24-1287 with instructions to dismiss for lack of jurisdiction.

6. Notwithstanding the Supreme Court's dispositive ruling, a separate and independent action by Plaintiff is necessary to secure the relief to which it is entitled. The affirmance of the Federal Circuit's judgment does not, standing alone, guarantee that Plaintiff—or any other importer that has paid IEEPA duties—will receive a refund of those unlawfully collected tariffs. Without Plaintiff's own judgment and judicial relief in this proceeding, there is no assurance that the duties paid by Plaintiff will be refunded.

7. Plaintiff brings this action to preserve and protect its right to a refund of all IEEPA duties it has paid, irrespective of whether the subject entries have been liquidated or remain unliquidated.

Unless Plaintiff obtains its own judgment, there is a substantial risk that its entries will be deemed final upon liquidation, thereby extinguishing its right to recover duties that were unlawfully collected by Defendants.

8. Plaintiff has been damaged by Defendants' collection of the IEEPA tariffs in amounts to be determined, and it has no adequate remedy at law other than the relief sought herein.

9. Accordingly, Plaintiff respectfully requests that this Court enter judgment in its favor and grant the following relief: (i) a declaratory judgment that the IEEPA duties and the executive orders pursuant to which those duties were imposed are unlawful and without legal effect; (ii) a permanent injunction restraining and enjoining Defendants from assessing or collecting any further IEEPA duties on Plaintiff's entries; and (iii) an order directing Defendants to refund to Plaintiff all IEEPA duties paid by Plaintiff to the United States in connection with the executive orders challenged in this action, without regard to the liquidation status of the entries on which such duties were paid, together with any interest, costs, and such other relief as this Court deems just and proper.

## PARTIES

**Plaintiff**

10. Plaintiff Kulamoon, Inc. ("Kulamoon" or "Plaintiff") is a corporation organized and existing under the laws of the State of California, with its principal place of business in the United States. Kulamoon is a U.S.-based importer of merchandise subject to the IEEPA duties challenged in this action.

**Defendants**

11. Defendant United States Customs and Border Protection ("CBP") is a federal law enforcement agency and component of the United States Department of Homeland Security ("DHS"), headquartered in Washington, D.C. CBP is charged with, among other things, securing the

nation's borders and administering the assessment and collection of customs duties, tariffs, and taxes on goods imported into the United States. In that capacity, CBP assessed and collected the unlawful IEEPA tariffs at issue in this action.

12. Defendant Rodney S. Scott is the Commissioner of CBP and, as such, is the principal officer responsible for CBP's administration and enforcement of the customs laws. Commissioner Scott is sued solely in his official capacity.

13. Defendant United States of America is the sovereign that received and retains the disputed tariff payments at issue in this action. The United States is a statutory defendant pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

14. Defendants United States Customs and Border Protection, Commissioner Rodney S. Scott, and the United States of America are referred to collectively herein as "Defendants."

**JURISDICTION**

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i). Jurisdiction under § 1581(i) has been specifically confirmed in the context of IEEPA tariff challenges by both the Federal Circuit and the Supreme Court. See V.O.S. Selections, Inc. v. Trump, 149 F.4th 1312, 1334 (Fed. Cir. 2025), aff'd, No. 25-250, 2026 WL 477534 (U.S. Feb. 20, 2026).

16. Section 1581(i) confers upon this Court exclusive jurisdiction over civil actions commenced against the United States that arise out of any law of the United States providing for, among other things, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), as well as "administration and enforcement with respect to the matters referred to in paragraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section," id. § 1581(i)(1)(D).

17. The claims asserted in this action directly implicate those statutory provisions. The executive orders at issue effected amendments to the Harmonized Tariff Schedule of the United States ("HTSUS") — a law of the United States establishing tariff rates on imported merchandise. Because this action challenges the lawfulness of those executive orders and the tariffs assessed pursuant thereto, subject matter jurisdiction is properly vested in this Court under 28 U.S.C. § 1581(i). See V.O.S. Selections, 149 F.4th at 1329; Learning Resources, 2026 WL 477534, at *6.

18. This Court possesses the same powers in law, equity, and by statute as a United States District Court. 28 U.S.C. § 1585. In a civil action arising under 28 U.S.C. § 1581, this Court is authorized to enter a monetary judgment against the United States and to grant any other form of appropriate civil relief, including declaratory judgments, permanent injunctions, orders of remand, and writs of mandamus or prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

19. Plaintiff has Article III standing to prosecute this action. Plaintiff is the importer of record for merchandise imported into the United States from countries subject to the IEEPA duties assessed and collected by CBP pursuant to the challenged executive orders. As a direct and proximate result of those orders, Plaintiff has paid IEEPA duties to the United States, thereby suffering a concrete and particularized economic injury fairly traceable to Defendants' conduct.

20. Plaintiff's injuries are redressable by this Court. A declaratory judgment that the IEEPA duties and the underlying executive orders are unlawful, together with injunctive relief preventing further collection and an order directing the refund of all duties unlawfully paid, would fully redress the harm Plaintiff has suffered and continues to suffer. Plaintiff therefore satisfies all three elements of constitutional standing — injury in fact, causation, and redressability. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).

## GENERAL PLEADINGS

### I. President Trump invoked his authority under IEEPA to impose a series of tariffs.

#### A. The IEEPA duties

21. On February 1, 2025, President Trump simultaneously issued three executive orders imposing new tariffs on imports from Canada, Mexico, and China, respectively. Each order rested on IEEPA as the claimed source of presidential authority and predicated the imposition of tariffs upon the existence of a declared national emergency. These three orders are referred to collectively herein as the "Fentanyl Tariff Orders."

22. The executive order directed at Mexico — Executive Order 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025) (the "Mexico Tariff Order") — imposed an additional 25 percent *ad valorem* tariff on all goods imported from Mexico. The President grounded his claim of emergency authority in "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.*

23. The executive order directed at Canada — Executive Order 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025) (the "Canada Tariff Order") — similarly declared a national emergency predicated on the trafficking of opioids across the northern border and imposed an additional 25 percent tariff on imports from Canada, subject to certain enumerated exceptions.

24. The executive order directed at China — Executive Order 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025) (the "China Tariff Order") — declared a national emergency on the ground that "the sustained influx of synthetic opioids" constituted a threat to the United States, and further found

that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce." The President's assertion of emergency authority was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.*

25. The China Tariff Order imposed an additional 10 percent *ad valorem* tariff on all products imported from China, assessed on top of any pre-existing duties otherwise applicable to such goods.

26. Four days after issuance of the China Tariff Order, on February 5, 2025, the President issued Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,277 (Feb. 11, 2025) (the "February 5 Amendment"), further modifying the tariff regime applicable to Chinese imports.

27. The following month, on March 3, 2025, the President again amended the China Tariff Order through Executive Order 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025) (the "March 3 Amendment"). The March 3 Amendment increased the incremental IEEPA tariff on imports from China from 10 percent to 20 percent, with the President asserting that "the PRC has not taken adequate steps to alleviate the illicit drug crisis" as justification for the escalation.

28. On April 2, 2025, President Trump issued Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025) (the "Reciprocal Tariff Order"), invoking IEEPA and declaring a national emergency predicated on the United States' trade deficits with its trading partners. The Reciprocal Tariff Order established a 10 percent

baseline tariff on virtually all imports into the United States, effective April 5, 2025, and imposed additional country-specific "reciprocal" tariffs on 57 countries, effective April 9, 2025, ranging from 11 percent to 50 percent. *Id.* at Annex I. The order asserted that "U.S. trading partners' economic policies . . . suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." *Id.* at 15,041.

29. On April 8, 2025, in direct response to retaliatory measures announced by China, the President issued Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025), which raised the reciprocal tariff rate on Chinese imports by 50 percentage points — from 34 percent to 84 percent.

30. The following day, April 9, 2025, the President issued Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025), which suspended for 90 days the higher country-specific reciprocal tariffs on all countries other than China. For China, the reciprocal tariff rate was simultaneously raised again — from 84 percent to 125 percent. With the previously imposed 20 percent fentanyl-related trafficking tariff remaining in effect and running concurrently, most merchandise imported from China faced a minimum aggregate IEEPA tariff burden of 145 percent.

31. In implementing this executive order-based tariff regime, Defendants directed amendments to the Harmonized Tariff Schedule of the United States ("HTSUS"), requiring importers to enter goods subject to the challenged tariffs under newly assigned tariff classification codes, thereby effectuating the collection of those duties at the border.

32. On April 14, 2025, several companies commenced an action in this Court directly challenging the legality of the foregoing executive orders. *See V.O.S. Selections, et al. v. Donald J. Trump, et*

*al.*, No. 25-cv-00066, ECF No. 2 (Apr. 14, 2025). As set forth more fully below, this Court held those orders to be unlawful; the Federal Circuit, sitting *en banc*, affirmed; and the Supreme Court subsequently affirmed as well.

33. In the months following the filing of the *V.O.S. Selections* complaint, President Trump, purporting to act under IEEPA, issued additional executive orders imposing further tariffs and modifying existing ones. This action, however, is expressly limited in scope: Plaintiff challenges only those executive orders that the Federal Circuit has already adjudicated and held to be unlawful, and which the Supreme Court likewise found to be unlawful (collectively, the "Challenged Tariff Orders"). Plaintiff expressly reserves all rights with respect to any additional executive orders not encompassed within this Complaint.

**B. CBP's implementation of the unlawful tariffs**

34. CBP is the federal agency statutorily charged with the assessment and collection of all customs duties on merchandise imported into the United States, including the IEEPA duties at issue in this action. *See* 19 U.S.C. §§ 1500, 1502. In that capacity, CBP serves as the primary administrative mechanism through which tariff obligations imposed by executive order are enforced and collected at the border.

35. The governing tariff nomenclature used by CBP is the Harmonized Tariff Schedule of the United States ("HTSUS"), which Congress adopted as part of the Omnibus Trade and Competitiveness Act of 1988. Pub. L. No. 100–418, 102 Stat. 1107 (1988). The HTSUS establishes tariff rates and statistical categories through a hierarchical structure of nested chapters, headings, and subheadings. 19 U.S.C. § 1202. The primary headings describe broad categories of merchandise, while the subheadings provide increasingly particularized classifications of goods within each category. *Id.* CBP classifies all merchandise imported into the United States in accordance with this hierarchical schedule.

36. CBP's own regulations mandate that "[m]erchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings." 19 C.F.R. § 152.11. Classification under the HTSUS thus governs the applicable duty rate assessed on any given entry of imported merchandise.

37. The United States International Trade Commission ("USITC") is responsible for publishing and maintaining the HTSUS, consistent with applicable presidential orders and statutory directives. 19 U.S.C. §§ 1202, 3005, 3006. The authority to modify the HTSUS itself rests with the President. *See Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President"); *see also Maple Leaf Marketing, Inc. v. United States*, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021). It was pursuant to this authority that the Challenged Tariff Orders directed amendments to the HTSUS to implement the IEEPA duties at issue in this action.

38. Upon the entry of goods into the United States, CBP verifies the correct HTSUS classification of the imported merchandise and, based upon that classification, assesses and collects the applicable tariff rates set forth in the HTSUS. 19 U.S.C. §§ 1202, 1500, 1502. It is through this classification and collection process that Defendants assessed and collected the unlawful IEEPA duties paid by Plaintiff on its imported merchandise.

### C. Liquidation

39. Under federal customs regulations, "'Liquidation' means the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1. Liquidation is therefore the administrative process by which CBP finalizes the duty obligation on any given entry of imported merchandise.

40. Upon the importation of goods into the United States, the importer of record is required to file a customs entry declaration setting forth the value, country of origin, and HTSUS classification of

the imported merchandise, and to tender an estimated duty payment based on that declaration. *See* 19 U.S.C. § 1484. CBP thereafter reviews the customs declaration, may physically inspect the imported goods, and conducts its own independent review of the declared classification and valuation.

41. Following that review, CBP fixes the final appraisement of the merchandise — confirming the correct value, tariff classification, applicable duty rate, and the final amount of duties owed on each entry. *See* 19 U.S.C. § 1500. This determination forms the basis for liquidation.

42. Upon finalizing its appraisement, CBP liquidates the entry and issues notice to the importer of record indicating either that an additional duty payment is owed or that a refund is due. *See* 19 U.S.C. § 1504(b). Liquidation thus represents the binding administrative conclusion of the duty assessment process for each entry.

43. Unless extended, liquidation must occur within one year of the date of entry. *See* 19 U.S.C. § 1504(a). In practice, liquidation typically occurs automatically by operation of law, with CBP generally liquidating entries approximately 314 days after the date of entry and posting public notice on its website. CBP retains discretion to extend the liquidation deadline for up to one additional year upon a showing of good cause and at the request of the importer of record. *See* 19 U.S.C. § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

44. Beyond the administrative extension mechanism, this Court possesses independent equitable authority to suspend liquidation pending judicial resolution of a challenge to the underlying duties. *See, e.g., In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021). The exercise of that equitable authority preserves importers' ability to seek refunds while their claims are being adjudicated.

45. Once liquidation has occurred, an importer of record may — where the liquidation is protestable — file a protest within 180 days, requesting that CBP reliquidate the entry and adjust the duty

amount. *See* 19 U.S.C. § 1514. CBP also retains authority to voluntarily reliquidate an entry within 90 days of the original liquidation. *See id.* § 1501. Critically, however, not all liquidations are protestable: where CBP acts in a purely ministerial capacity — that is, without the exercise of discretion — in assessing a duty, the resulting liquidation is not subject to protest and cannot be contested through the administrative protest mechanism. *Id.*; *see also Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024).

46. Both this Court and the Federal Circuit have recognized that an importer may be foreclosed from recovering refunds of unlawfully assessed duties on entries that have already liquidated, even where the underlying tariff is subsequently adjudicated to be unlawful. *See In re Section 301 Cases*, 524 F. Supp. 3d at 1365–66; *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025). This legal uncertainty underscores the necessity of Plaintiff commencing this independent action.

47. This Court has recently addressed this precise issue in the context of challenges to the same IEEPA duties at issue here. In *AGS Company Automotive Solutions v. United States*, plaintiffs filed suit in this Court challenging the legality of the IEEPA duties — the same duties challenged in *V.O.S. Selections*. *AGS*, No. 25-00255, ECF No. 3 at 7.

48. Similarly, in *Popsockets, LLC v. United States*, the plaintiff challenged those same IEEPA duties and additionally contested the lawfulness of IEEPA-based tariffs imposed on merchandise imported from Brazil and India pursuant to Executive Order 14323, *Addressing Threats to the United States by the Government of Brazil*, 90 Fed. Reg. 37,739 (July 30, 2025); Executive Order 14329, *Addressing Threats to the United States by the Government of the Russian Federation*, 90 Fed. Reg. 38,701 (Aug. 6, 2025); and Executive Order 14361, *Modifying the Scope of Tariffs on the Government of Brazil*, 90 Fed. Reg. 54,467 (Nov. 20, 2025). *Popsockets*, No. 25-00379, ECF No. 4 at 5.

49. In the *Popsockets* proceeding, the Defendants — the same parties named as Defendants in this action — entered into a formal stipulation acknowledging that they would not oppose this Court's authority to order reliquidation of entries subject to the challenged IEEPA duties, and further agreeing that they would refund any IEEPA duties determined to have been unlawfully collected, following the issuance of a final and unappealable judicial decision so holding. *Popsockets*, No. 25-00379, ECF No. 8 at 1.

50. Relying upon Defendants' stipulation and this Court's jurisdiction under 28 U.S.C. § 1581(i), this Court thereafter held that it possesses "the explicit power to order reliquidation and refunds where the government has unlawfully exacted duties." *AGS*, No. 25-00255, ECF No. 29 at 6. That ruling firmly establishes this Court's authority to grant the full relief — including refunds of all unlawfully collected IEEPA duties — that Plaintiff seeks in this action.

## II. IEEPA does not authorize tariffs.

51. The Challenged Tariff Orders purport to draw authority from multiple statutory sources, including IEEPA, 50 U.S.C. § 1701 *et seq.*; the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*; section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301. Each of these statutes is identified in the operative executive orders as a purported source of presidential authority to impose the challenged tariffs.

52. None of the foregoing statutes, however, confers upon the President the authority to impose tariffs. Among them, it is IEEPA upon which the President and CBP principally rely as the operative basis for imposing and collecting the IEEPA duties at issue in this action. As the Supreme Court held in *Learning Resources, Inc. v. Trump*, 2026 WL 477534 (U.S. Feb. 20, 2026), that reliance is misplaced — IEEPA simply does not authorize what the Challenged Tariff Orders purport to impose.

53. IEEPA grants the President certain enumerated emergency powers, but those powers are

expressly limited in scope and purpose: they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). The statute thus confines presidential action to the specific powers enumerated within its text and only in response to a qualifying declared emergency.

54. The powers IEEPA enumerates are narrow and do not encompass the imposition of tariffs. First, IEEPA authorizes the President to "investigate, regulate, or prohibit" certain transactions in foreign exchange, payments through financial institutions involving foreign countries or nationals, or the importation of "currency or securities." 50 U.S.C. § 1702(a)(1)(A). This provision is directed at financial and monetary transactions — not the general importation of commercial merchandise.

55. Second, IEEPA permits the President to block, freeze, or otherwise prohibit the transfer, movement, or importation of property or funds in which a foreign country or foreign national holds an interest, provided such property or funds are subject to the jurisdiction of the United States. 50 U.S.C. § 1702(a)(1)(B). This authority is likewise directed at blocking or prohibiting specified transactions — not at imposing revenue-generating tariffs on imported goods.

56. Third, and most narrowly, IEEPA authorizes the President to "confiscate" property belonging to a foreign person or foreign country only when the United States is engaged in "armed hostilities" or has been attacked by a foreign country, provided the property is subject to U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(C). This provision plainly has no application to the tariff regime established by the Challenged Tariff Orders.

57. Critically, the text of IEEPA contains no reference to the word "tariff," nor does it employ any term of equivalent import or meaning. IEEPA was originally enacted in 1977 as a limitation on, and replacement for, the broad emergency economic powers previously available under the

Trading with the Enemy Act. Although IEEPA has been amended on multiple occasions since its enactment, it has never been amended to authorize the imposition of tariffs, and no prior President has ever invoked IEEPA as authority to impose tariffs on imported goods. The Challenged Tariff Orders thus represent an unprecedented and legally unsupported expansion of presidential authority that finds no basis in the statute's text, structure, or history.

**1. The U.S. Constitution vests in Congress—not the President—the power to impose tariffs.**

58. The Constitution of the United States vests all legislative power exclusively in Congress: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. This foundational principle reflects the Framers' deliberate choice to place the lawmaking power — including the power to tax and regulate commerce — in the branch most directly accountable to the people.

59. Among the legislative powers so vested, the Constitution expressly grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises," U.S. Const. art. I, § 8, cl. 1 (the "Taxing Clause"), and "[t]o regulate Commerce with foreign Nations," *id.* cl. 3 (the "Commerce Clause"). It has long been settled that the imposition of tariffs on imported merchandise falls squarely within both the Taxing Clause and the Commerce Clause, and therefore within Congress's exclusive constitutional domain.

60. While Congress may, under appropriate circumstances, delegate a measure of its constitutional authority to the Executive Branch, any such delegation must — at an absolute minimum — supply an intelligible principle that adequately defines and constrains the scope of the authority conveyed. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025). IEEPA provides no such intelligible principle with respect to the imposition of tariffs. *Learning Resources*, 2026 WL 477534, at *10. The statute therefore cannot serve as a constitutional basis for the Challenged Tariff Orders.

61. Construing IEEPA to authorize the imposition of tariffs would, moreover, render the statute at least partially unconstitutional. As the Supreme Court expressly recognized, IEEPA grants the President authority to "regulate … importation or exportation," 50 U.S.C. § 1702(a)(1)(B) — but taxing exports is flatly prohibited by the Constitution. U.S. Const. art. I, § 9, cl. 5. The Supreme Court in *Learning Resources* observed that reading IEEPA to authorize tariffs "would render IEEPA partly unconstitutional," and declined to adopt an interpretation of the statute that would produce that result. *Learning Resources*, 2026 WL 477534, at *11.

62. The major questions doctrine independently forecloses the President's tariff authority under IEEPA. Courts require Congress to "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Where Congress has not done so, the Executive's claimed authority over matters of such significance cannot stand. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

63. The Challenged Tariff Orders unquestionably implicate matters of vast economic and political significance. *Learning Resources*, 2026 WL 477534, at *9. The Supreme Court found the power to impose tariffs to be conspicuously "[a]bsent from the lengthy list of powers" conferred upon the President by IEEPA, and concluded that "the power to 'regulate … importation' does not fill that void."* Id.* at *10*. The Court further observed: "We are therefore skeptical that in IEEPA — and IEEPA alone — Congress hid a delegation of its birth-right power to tax within the quotidian power to 'regulate.'" *Id.* Under the major questions doctrine, the absence of a clear congressional statement authorizing tariffs of this scale and scope is itself dispositive.

64. Taken together, IEEPA's text, structure, constitutional constraints, and the Supreme Court's controlling interpretation in *Learning Resources* compel the conclusion that the Challenged Tariff Orders are unlawful. Defendants possess no statutory or constitutional authority to

implement, assess, or collect the IEEPA duties imposed by those orders, and those duties must be declared void and refunded in their entirety.

**B. Courts, including this Court, have agreed the IEEPA duties are not authorized.**

65. On May 28, 2025, a three-judge panel of this Court granted summary judgment in favor of the plaintiffs in V.O.S. Selections, Inc. v. United States, holding that the IEEPA duties at issue were unlawful and entering a permanent injunction prohibiting the government from enforcing those duties. The government timely appealed that decision and injunction to the United States Court of Appeals for the Federal Circuit.

66. Pending appeal, the Federal Circuit stayed this Court's judgment and permanent injunction, and simultaneously ordered an expedited briefing schedule and set the matter for accelerated oral argument, reflecting the extraordinary economic significance of the questions presented.

67. On August 29, 2025, the Federal Circuit, sitting *en banc*, issued its decision affirming this Court's judgment in full and holding that the IEEPA duties are unlawful. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025). The Supreme Court thereafter granted certiorari on September 9, 2025. *Id.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

68. Concurrently, a separate group of importers filed suit in the United States District Court for the District of Columbia, challenging the same IEEPA tariff regime. That court likewise held that IEEPA does not authorize the imposition of tariffs of any kind. *Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025). The government appealed to the United States Court of Appeals for the D.C. Circuit, but before the D.C. Circuit could hear argument, the Supreme Court granted certiorari before judgment in that case as well. *Id.*, *cert. granted before judgment*, No. 24-1287, 2025 WL

2601021 (U.S. Sept. 9, 2025).

69. The Supreme Court consolidated the two cases — *V.O.S. Selections* and *Learning Resources* — for briefing and argument. Oral argument was held on November 5, 2025, before the full Court. The consolidation of these two cases, arising from separate circuits and presenting the same core legal question, underscored the national importance and urgency of the IEEPA tariff issue.

70. On February 20, 2026, the Supreme Court issued its opinion, affirming this Court's decision and the Federal Circuit's judgment and holding definitively that the IEEPA duties are unlawful. *Learning Resources, Inc. v. Trump*, 2026 WL 477534, at *13–14 (U.S. Feb. 20, 2026). The Supreme Court affirmed the Federal Circuit's judgment in Appeal No. 25-250 and vacated and remanded Appeal No. 24-1287 with instructions to dismiss for lack of jurisdiction. That decision is now final and binding, and it controls the disposition of this action.

**III. Plaintiff paid preliminary IEEPA duties.**

71. As of the date of this Complaint, Plaintiff has paid IEEPA duties assessed pursuant to the Challenged Tariff Orders on merchandise imported into the United States. Those payments were made on a continuous and ongoing basis throughout the period during which the Challenged Tariff Orders have been in effect.

72. Plaintiff's imported merchandise subject to the IEEPA duties was entered into the United States from foreign countries under the new HTSUS tariff codes implemented by Defendants in connection with the Challenged Tariff Orders. Plaintiff, as the importer of record for those entries, bore direct and sole financial responsibility for the payment of the assessed IEEPA duties.

73. As of the date of this filing, entries for which Plaintiff has paid IEEPA duties pursuant to the

Challenged Tariff Orders have begun to liquidate and will continue to liquidate during the pendency of this action. Absent judicial intervention — including an order suspending liquidation — Plaintiff's entries may be deemed administratively final upon liquidation, potentially extinguishing Plaintiff's right to recover the unlawfully collected duties.

**IV. Plaintiff is "similarly situated" to other plaintiffs before this court.**

74. Defendants have formally stipulated, in prior proceedings before this Court, that importers "similarly situated" to the plaintiffs in those proceedings are entitled to equivalent relief in connection with the challenged IEEPA duties, in the event those duties are found to have been unlawfully collected.

75. In *Popsockets, LLC v. United States*, No. 25-00379, the parties agreed that:

> [T]he term "IEEPA duties" refers to all entries for which plaintiff was the importer of record and that are subject to the duties imposed by the executive actions plaintiff challenges in its complaint or any amendment thereto. The parties understand that defendants will only refund IEEPA duties collected pursuant to the executive actions that are found to be unlawful[.]
>
> *Popsockets*, No. 25-00379, ECF No. 8 at 2.

*76.* In *AGS Company Automotive Solutions v. United States*, No. 25-00255, Defendants — the same parties named as Defendants in this action — expressly acknowledged this Court's incorporation of the *Popsockets* stipulations into the *AGS* proceedings. *AGS*, No. 25-00255, ECF No. 34 at 1–2, *citing* ECF No. 29 at 5. Defendants further stipulated in *AGS* that: Similarly situated plaintiffs are those who challenge IEEPA tariffs in a manner and on grounds that substantially overlap with the IEEPA tariffs cases presently before the Supreme Court. … [G]enerally a properly raised IEEPA tariff challenge would be subject to the stipulation.

> *Similarly situated plaintiffs are those who challenge IEEPA tariffs in a manner and on grounds that substantially overlap with the IEEPA tariffs cases presently before the Supreme Court. … [G]enerally a properly raised IEEPA tariff challenge would be subject to the stipulation.*

*AGS*, No. 25-00255, ECF 34 at 2.

77. Plaintiff in this action challenges the IEEPA tariffs in a manner and on grounds that substantially overlap with the challenges brought by the plaintiffs in *V.O.S. Selections*, *AGS, Popsockets*, and the thousands of related cases currently pending before this Court. Plaintiff therefore qualifies as a "similarly situated" plaintiff within the meaning of Defendants' stipulations in *AGS* and *Popsockets*, and is entitled to the same relief to which Defendants have already committed.

78. Pursuant to those stipulations, Defendants may not oppose this Court's authority to order the reliquidation of Plaintiff's entries of merchandise subject to the challenged IEEPA duties. Defendants are further bound by their prior commitments to refund any IEEPA duties determined to have been unlawfully collected, following the issuance of a final and unappealable judicial decision so holding and directing such refund. Defendants' stipulations, combined with the Supreme Court's controlling decision in Learning Resources, establish that Plaintiff is entitled to a full refund of all IEEPA duties it has paid on the Challenged Tariff Order.

**STATEMENT OF CLAIMS**

**COUNT I**

**THE CHALLENGED TARIFF ORDERS ARE *ULTRA VIRES* UNDER *V.O.S. SELECTIONS***

79. Plaintiff hereby incorporates by reference each and every allegation set forth in paragraphs 1 through 78 of this Complaint as though fully set forth herein.

80. This Court, in *V.O.S. Selections, Inc. v. Donald J. Trump*, 772 F. Supp. 3d 1350, 1383 (Ct. Int'l Trade 2025), aff'd, 149 F.4th 1312 (Fed. Cir. 2025), held that the President exceeded his statutory authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq., by imposing tariffs on imported goods. That decision

— affirmed by the Federal Circuit sitting en banc and subsequently by the Supreme Court of the United States — is controlling precedent in this action.

81. As this Court expressly recognized in *V.O.S. Selections*, IEEPA grants the President authority only to "investigate, regulate, or prohibit" certain categories of foreign financial transactions and property interests during periods of declared national emergency. The statute does not authorize the President to impose tariffs or duties on imported merchandise. Neither the text of IEEPA nor its legislative history reflects any clear and express congressional delegation of authority to the President to establish or modify tariff rates. In the absence of such a clear statement, no such delegation can be implied.

82. The Federal Circuit, sitting en banc, affirmed that interpretation in full, holding that Congress did not clearly delegate to the President the power to impose tariffs under IEEPA, and that construing IEEPA to permit such authority would raise grave constitutional concerns under both the major questions doctrine and the non-delegation doctrine. V.O.S. Selections, 149 F.4th at 1312.

83. The Supreme Court of the United States thereafter affirmed, holding definitively and unambiguously that "the terms of IEEPA do not authorize tariffs." *Learning Resources, Inc. v. Trump*, 2026 WL 477534, at *13 (U.S. Feb. 20, 2026). That holding is binding on this Court and dispositive of the central legal question presented in this action.

84. The Challenged Tariff Orders are materially identical in structure, claimed legal authority, and practical effect to the executive orders struck down in *V.O.S. Selections*. Like those orders, the Challenged Tariff Orders purport to impose duties on imported merchandise and to direct amendments to the Harmonized Tariff Schedule of the United States solely on the basis of IEEPA authority. They are therefore unlawful for precisely the same reasons articulated by this Court, affirmed by the Federal Circuit, and confirmed by the Supreme

Court: the President lacked statutory authority under IEEPA to impose them. The Challenged Tariff Orders are void ab initio and without legal force or effect as applied to Plaintiff and its imported merchandise.

85. As a direct and proximate result of Defendants' unlawful assessment and collection of the IEEPA duties, Plaintiff has suffered, and continues to suffer, concrete economic harm in the form of duty payments made to the United States in amounts to be established at trial or upon further proceedings. Plaintiff has no adequate remedy at law to recover those payments absent the judicial relief sought herein.

86. Plaintiff respectfully requests that this Court apply its own precedent and the binding decisions of the Federal Circuit and the Supreme Court of the United States, and enter judgment in Plaintiff's favor: (i) declaring the Challenged Tariff Orders unlawful, void ab initio, and without legal effect as applied to Plaintiff; (ii) permanently enjoining Defendants from assessing, collecting, or enforcing the IEEPA duties against Plaintiff on any present or future entries; and (iii) ordering Defendants to refund to Plaintiff all IEEPA duties collected from Plaintiff pursuant to the Challenged Tariff Orders, together with interest as provided by law and such other and further relief as this Court deems just and proper.

**COUNT II**

**(DECLARATORY RELIEF, 28 U.S.C. § 2201)**

87. Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 85 of this Complaint as though fully set forth herein.

88. The Declaratory Judgment Act grants federal courts the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a). A declaratory judgment is warranted where there exists an actual, concrete, and justiciable controversy between the parties regarding their respective legal rights and obligations.

89. An actual controversy of sufficient immediacy and concreteness exists between Plaintiff and Defendants. Specifically, this action presents a live and justiciable dispute concerning: (i) whether the President possessed authority under IEEPA to issue the Challenged Tariff Orders; (ii) whether IEEPA, as applied to authorize the imposition of tariffs, is consistent with the United States Constitution, including the Taxing Clause, the Commerce Clause, the major questions doctrine, and the non-delegation doctrine; and (iii) whether Defendants possess lawful authority to implement, enforce, assess, and collect the IEEPA duties imposed by those orders.

90. Plaintiff is the importer of record for merchandise imported into the United States that has been subjected to IEEPA duties pursuant to the Challenged Tariff Orders. As a direct consequence of those orders, Plaintiff has been required to pay substantial IEEPA duties to the United States, thereby suffering a concrete, particularized, and ongoing economic injury that is directly traceable to Defendants' conduct and fully redressable by the relief sought herein.

91. The legal questions presented in this Count have been conclusively resolved against Defendants by this Court in V.O.S. Selections, by the Federal Circuit sitting en banc, and by the Supreme Court of the United States in Learning Resources. Notwithstanding those controlling decisions, Defendants continue to assess and collect IEEPA duties in the absence of a specific judgment entered in favor of Plaintiff, leaving Plaintiff without a guarantee of refund for duties already unlawfully paid and at risk of having its entries liquidated in a manner that forecloses future recovery.

92. This Court has the authority and jurisdiction, pursuant to its equitable powers and 28 U.S.C. § 2201, to enter a declaratory judgment: (i) that the Challenged Tariff Orders exceed the President's authority under IEEPA and are therefore unlawful and void ab initio; (ii) that IEEPA does not authorize the imposition of tariffs or the modification of the Harmonized Tariff Schedule for the purpose of collecting tariff revenue; and (iii) that Defendants lack lawful

authority to implement, enforce, assess, or collect the IEEPA duties imposed by the Challenged Tariff Orders as applied to Plaintiff's entries of imported merchandise.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a) Declare that the President lacks authority under IEEPA to impose the challenged tariffs;

b) Declare that the Challenged Tariff Orders are *ultra vires* and void *ab initio* with respect to Plaintiff;

c) Declare that, with respect to Plaintiff, CBP lacks authority to implement, enforce, administer, and collect any tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

d) With respect to Plaintiff, enjoin Defendants from imposing, enforcing, administering, or collecting any tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

e) Order Defendants to refund to Plaintiff all IEEPA duties collected on its entries, regardless of liquidation status, including those that it continues to collect during the pendency of this action, with interest as provided by law;

f) Award Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

g) Grant such further relief as this Court deems proper.

Dated: May 5, 2026

Respectfully submitted,

*/s/ Xiyan Zhang*
Xiyan Zhang
STRATUM LAW LLC
xzhang@stratumlaw.com
18 Campus Blvd. Ste. 100
Newton Square, PA 19073
*Counsel for Plaintiff Kulamoon, Inc.*